THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* VIOLA GAGE, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* ARTHUR UNGER, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* GUY DUREY et al., as Executors of CYRUS DUREY, Deceased, Respondents.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* KATHARINE G. FOLMSBEE et al., Respondents.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* JAMES W. GEARY et al., Respondents.

Third Department, March 24, 1948.

*Nathaniel L. Goldstein, Attorney-General, (Wendell P. Brown, Solicitor-General, Warren H. Gilman, Assistant Attorney-General, David Belkin* and *Emil Woldar, Special Assistant Attorneys-General* of counsel), for appellant.

*Dennison & Pulsifer,* attorneys (*Alfred D. Dennison* of counsel), for Viola Gage, Arthur Unger, and Guy Durey and another, as executors, respondents.

*Gideon G. W. Green,* for Katharine G. Folmsbee and Virtus R. Folmsbee, respondents.

*T. Cuthell Calderwood,* for James W. Geary and Sarah P. Geary, respondents.

HILL, P. J. These five actions for ejectment brought by the State of New York were tried together without consolidation. The jury returned unanimous verdicts in favor of each of the several defendants. Judgments dismissing the complaints have been entered against the State. Four of the actions were tried earlier with a like result at the Trial Term, judgments affirmed by the Appellate Division (268 App. Div. 1015) but reversed by the Court of Appeals (295 N. Y. 66). The fifth case has not been tried previously. The lands are contiguous to those occupied by the other defendants and the trial involves the same issues. The State acquired its title in 1918 from the Durey Land and Lumber Company. The entire tract, some 12,000 acres, was sold to the State for $4 an acre; about 2,000 acres was located in lot 60 of the Glen Bleecker and Lansing Patent. About 3.26 acres of land are involved in these five lawsuits. The five diminutive parcels are occupied by buildings

and homes of the five defendants and some were so occupied in 1918, at the time the State, after inspection, received the deed.

It is claimed by the respondents that the land involved is included within the exception contained in the deed to the State, which reads: " 4. The land under the waters of East Canada and Green Lakes lying within said lot Sixty, and containing 141.56 acres of land."

The opinion in the Court of Appeals stated (295 N. Y. 66): " Our examination of the record upon which rest claims by the State and the several defendants to land within the description last quoted above has led us to conclude that the fee title to that land passed to the State under the 1918 deed subject only to the right specifically reserved therein to East Creek Electric Light and Power Company ". (P. 71.)

These defendants do not claim under the reservation in favor of the East Creek Electric Light and Power Company. However, the decision of the court was that " the judgments should be reversed and a new trial granted, with costs to abide the event." (P. 72.)

Thus it must have been determined that there was an issue of fact which should be tried. The triable issue seems to be that discussed in another portion of the opinion, " No evidence was introduced by the defendants to establish that the map numbered ' 1096 ' mentioned in the 1918 deed, was inaccurate or that the areas and boundaries of East Canada Lake and Green Lake, as they appear on the map, were erroneous. Indeed, there is undisputed testimony by a forest engineer and land surveyor employed by the State Conservation Commission that an unbroken line appearing on map No. 1096 defined the boundaries of East Canada Lake and Green Lake and indicated that such boundaries were fixed by actual survey." (P. 72.)

Map No. 1096 was prepared by J. B. and B. H. Koetteritz, a firm of surveyors consisting of father and son. The former has died; the latter was a witness upon this trial and he stated that there was no actual survey made of the shore lines of East Canada Lake or of the portion of Green Lake here involved, and that he did not obtain the data as to the area under water in those two lakes from Map No. 1096. He gave the following testimony:

" Now there appears upon map 1096 a lettered area in the space marked Green Lake which is specified there as 46.76 acres, was that area ascertained from map 1096? A. I make a separate map of that.

"Q. Then the area in Canada Lake in lot 60 marked 94.8 acres, was that ascertained from map 1096? A. It was not.

"Q. Where did you get your acreage from? A. Of these two pieces?

"Q. Yes. A. I made a separate map of them.

"Q. Do you know where that map came from, where you got your data for that map? A. Upon the latter I got it from consulting the Seidl map.

"Q. The Seidl map, is that the map upon which is shown this red line, flow line which also appears on Defendant's Exhibit 1? A. Yes sir.

"Have you made recently at my request a computation of the acreage of Green Lake from Defendants' Exhibit 1? A. I did.

"Q. I am asking whether or not this line upon this map is the same as the Seidl flow line? A. Yes, sir.

"Q. Was it to the Seidl flow line which you measured in making your computation of the acreage upon Green Lake? A. My father took this computation upon Green Lake.

"Q. You were there upon any part of it? A. I was there at times.

"Q. You know where he took it from. A. He took it from the red line.

"Q. The red line that is called the Seidl line? A. Yes sir."

In answer to questions by the court Mr. Koetteritz said:

"Q. Do I understand, Mr. Koetteritz that neither you nor your father, so far as you know, made any actual survey of the shore line or water line in the area which is now in controversy for the purpose of preparing and making map No. 1096? A. We did not.

"Q. Or for the purpose of computing the areas referred to in the exception No. four, that is the one of 141.56 acres of land? A. Except that I ran the shore line upon the east end of Green Lake at that point, the rest of it was all sketched and copied from other maps."

He says that his father used a planimeter in making the measurements, and that they were "practically correct" from what information he (the father) had.

The scale of map No. 1096 is one inch to thirty chains (1,980 feet). Little reliance as to location of lines can be placed on a map made on so small a scale. The lack of exactness as to the acreage in these two lakes is shown by a letter written in 1918, by one of the present trial counsel, then an attorney for the Durey Lumber Company, to the real estate deputy attached

to the Attorney-General's office. It contains this paragraph: " It is not possible to give a survey of the shore of the lakes embraced within these lots, but the acreages of the various exceptions which bound on the lakes have been carefully computed by · Mr. Koetteritz from the many maps which exist and are correct within such a small fraction that at the rate of four dollars an acre, the price at which the lands are sold, it can make little or no difference. I think you have a copy of Mr. Koetteritz' last map dated August, 1918." The map last mentioned was undoubtedly 1096.

Numerous persons acquainted with the locality testified in substance that the lands claimed by the defendants in these five actions are covered by exception No. 4, contained in the December, 1918, deed, and that the land is made land by filling. Defendants received title directly or through mesne conveyance from the Drury interests.

The judgments should be affirmed, with costs and disbursements of all trials and appeals in each case against the plaintiff.

HEFFERNAN, FOSTER, RUSSELL and DEYO, JJ., concur.

Judgments affirmed, with costs and disbursements of all trials and appeals in each case against the appellant, State of New York.